UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TERRY COLEY,

        Petitioner,

    v.

MJ KING,

        Respondent.

**DECISION AND ORDER**

6:24-CV-06003 EAW

## I.    **INTRODUCTION**

*Pro se* petitioner Terry Coley ("Petitioner"), a prisoner in the custody of the New York State Department of Corrections and Community Supervision,[1] seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Dkt. 1).  Petitioner challenges the constitutionality of the judgment entered against him on October 16, 2017, in New York State Supreme Court, Monroe County (Moran, J.).  (*Id.* at 1).[2]  Petitioner was convicted after a jury trial of five counts of second-degree robbery (New York Penal Law ("P.L.") § 160.10(2)(b)).  He is presently serving an aggregate sentence of 20 years in prison, to be followed by five years of post-release supervision.  For the reasons below, the request for a writ of habeas corpus is denied, and the petition is dismissed.

---

[1]    *See* New York State Department of Corrections and Community Supervision Incarcerated Lookup, *available at* https://nysdoccslookup.doccs.ny.gov/ (search results for DIN 17B3185) (last accessed July 6, 2026).

[2]    Page citations to pleadings filed by Petitioner and Respondent are to the pagination automatically generated by the Court's case management and electronic filing system (CM/ECF) and located in the header of each page.

## II.    BACKGROUND

### A.    Crime and Indictment

The judgment of conviction at issue stems from a series of armed robberies in the Town of Irondequoit during the months of May, June, August, and September 2016.  The perpetrator—wearing the same all-black outfit and ski mask and wielding the same small black gun—robbed the Kwik Fill gas station on Hudson Avenue four times and the Irondequoit branch of the ESL Federal Credit Union ("ESL") once.  Each incident was captured on surveillance video.

Petitioner was apprehended shortly after the last Kwik Fill robbery on September 14, 2016.  Police followed a GPS tracker that had been concealed in stolen money to a nearby apartment Petitioner shared with his aunt.  Petitioner was found in his bedroom with the stolen money, the disassembled GPS tracker, items of black clothing and footwear, and two black ski masks.

On March 7, 2017, a Monroe County grand jury returned indictment number 2017-0225 charging Petitioner with five counts of P.L. § 160.10(2)(b), an armed felony offense as defined in New York Criminal Procedure Law ("C.P.L.") § 1.20(41).  (SR: 85-90).[3]

---

[3]    Citations to "SR:" refer to the Bates-stamped page numbers of the state court records, filed at Docket 15-2.

### B.    Trial

#### 1.    The Prosecution's Case

##### a.    The May 20, 2016 Kwik Fill Robbery

At about 9:20 p.m. on May 20, 2016, a slender man dressed all in black, wearing a ski mask, and clutching "something shiny in his hands," ran in front of Natasha Astacio's car as she was driving down Hudson Avenue; the man was heading straight towards the Kwik Fill gas station.  (T: 300-03).[4]

Ashley Robare ("Robare"), who was working as the Kwik Fill clerk, was getting ready to close for the night.  The man ran into the store, held a small black gun to her face, and told her to give him all the money from the register.  (T: 563-64).  Robare described the perpetrator as an African-American man, wearing a black ski mask, black sweatshirt, black pants, and black gloves.  (T: 564-66).  Robare, who was "very close" to the robber, described the mask as having no nose opening, just eye and mouth openings with extra embroidery around them.  (T: 564-65).   Robare described the gloves the perpetrator wore as "all black," with "a little part of red on it."  (T: 566).  She identified the mask and gloves, People's Exhibits 46 and 48, respectively, at trial.  (T: 565-66).  Robare identified People's Exhibit 49 as the same gun the perpetrator used during the robbery, describing how he had pulled the slide back and pointed it at her face.  (T: 566-68).  Robare testified that the robber left the store after pocketing approximately $260 from the cash register.  (T: 268).

---

[4]    Citations to "T:" refer to the original pagination of the trial transcript, filed at pages 27 to 748 of Docket 15-3.  Citations to "S:" refer to the original pagination of the sentencing transcript, filed at pages 749 to 759 of Docket 15-3.

Dezmond Nauden was in his car across the street from the Kwik Fill when a figure wearing black pants, black shoes, and a black hoodie "darted past" him, heading away from the Kwik Fill and towards the Hill Court Circle apartments just down the road. (T: 398-401, 568-70).

### b.        The June 20, 2016 ESL Robbery

When the ESL Irondequoit branch opened at 9:00 a.m. on June 20, 2016, a man dressed in a black ski mask, a black hoodie, black pants, black shoes, black gloves, and brandishing a small black gun pushed past the entering customers and demanded "all the money in the branch." (*See*, *e.g.*, T: 378, 393, 408). The perpetrator went down the line of bank tellers and pointed the gun at each of them, telling them to put all their drawer money in a bag and threatening to shoot them if they did not comply, along with any bank customers who tried to leave. (*See*, *e.g.*, T: 379, 380-81, T: 411-12). The perpetrator was described by the tellers and customers as a slender man in his twenties, around six feet tall, and either Latino or a light-skinned African-American man, based on the skin exposed around the eye and mouth holes in the mask he was wearing. (*See*, *e.g.*, T: 380, 384-85 (Michael Torres); T: 396-97 (Cheryl Mercendetti); T: 408-09, 423, 426 (Dianalis Bianchi); T: 429 (Amber Heintzelman); T: 436-38 (Stephanie Kooijmans); T: 442-44 (Felicia Bryant), T: 455-56 (Edilberto Rosa-Sosa); T: 461-62 (Alberto Jimenez Zilueta); T: 474 (Palmire Rolle); T: 482-83 (Cynthia Joseph)). The robber repeatedly pulled the slide back to cock the gun, though nothing ejected from the firearm. (*See*, *e.g.*, T: 393, 412-13, 427-28, 445, 475, 550-51).

After holding each teller at gunpoint while they emptied their drawer, the perpetrator grabbed the bag filled with nearly $20,000 in cash and fled the bank. (T: 394, 411-18). Several of the tellers had placed dye packs in the bag, which exploded seconds after the perpetrator stepped outside the bank. (T: 269, 394, 417-18). The robber abandoned the stained cash in the parking lot and headed eastbound into the nearby Hill Court Circle apartment complex. (T: 464-65, 495-98).

Numerous witnesses identified People's Exhibits 46, 47, and 48, respectively, as the ski mask, hooded sweatshirt, and gloves worn by the robber; and People's Exhibit 49 as the gun used during the robbery. (*See*, *e.g.*, T: 381-82, 409-10, 416, 427, 443-45, 462-63, 47, 494, 500, 550-51).

### c. The August 3, 2016 Kwik Fill Robbery

Around 9:30 p.m. on August 3, 2016, Kwik Fill employees LaJames Ivey ("Ivey") and Keenan Graves ("Graves") were preparing to close for the night when a man with a gun came into the store. (T: 227, 522). Ivey was in the back office; Graves was at the cash register. (T: 227). The perpetrator had a slender build, appeared to be either Latino or a light-skinned black man, and wore a black hoodie, black jeans, black shoes, black gloves, and a black ski mask which he "kept pulling down . . . trying to hide something," like "some type of tattoo." (T: 228-29, 524-25). Each time the perpetrator pulled down on his mask, he "reveal[ed] a big portion of his face." (T: 247, 250-51).

The perpetrator walked up to Graves, pointed the gun at him, cocked it, and demanded all the cash in the drawer. (T: 227, 525). He then appeared to notice Ivey sitting

in the manager's office, pointed the gun at him, and said to both employees: "Move, you're dead."  (T: 228, 235).

Graves handed over all the money from the register, and the man walked out of the store towards the Hill Court Circle apartments.  (T: 228, 527).  Ivey identified People's Exhibit 46 as the mask worn by the perpetrator and People's Exhibit 49 as the gun used during the robbery.  (T: 244-46).

### d.    The August 24, 2016 Kwik Fill Robbery

On August 24, 2016, at approximately 9:30 p.m., Graves was working alone at the Kwik Fill when a tall, slender man dressed all in black with a ski mask and gloves came into the store with a gun and demanded money.  (T: 530-33).  Graves recognized the man as the perpetrator from the robbery three weeks earlier because he was wearing the same outfit and holding the same gun.  (T: 538-39).

As soon as he entered the store, the perpetrator checked the manager's office, but no one was in there.  (T: 531).  He approached the cash register and pointed the gun at Graves, saying, "You know the drill."  (T: 532, 537).  After Graves handed over all the money in the register, the perpetrator "jostled at [him] with the gun and said, 'That's it?'" (T: 538).  Graves got scared and handed over the cash from the store safe.  (T: 537-38). The robber then left.  A driver on Hudson Avenue spotted a man in all dark clothing running diagonally across the road away from the Kwik Fill, in the direction of the Hill Court Circle apartments.  (T: 584-85).

Following the August 24th robbery, representatives from Kwik Fill met with Irondequoit Police Department officers to see what else could be done to protect the store.

(T: 173-75).  The officers concealed a GPS tracking device within a stack of money and placed the stack of money in the Kwik Fill register on September 9, 2016.  (*Id.*).  The tracking device had the ability to send its location in real time to the police as soon as the device was removed from the drawer.  (T: 280-82).  The officers also placed some $5 bills on the tracker to help conceal it and recorded the bills' serial numbers.  (T: 283-84).

### e.    The September 14, 2016 Kwik Fill Robbery

On September 14, 2016, at approximately 8:50 p.m., Ivey was working the late shift at Kwik Fill with coworker Kieshawna Robinson ("Robinson").  (T: 236).  During their break, Ivey and Robinson were standing outside near the front door when a man dressed in all black came walking up the street towards the gas station.  (T: 190-92, 236-37).  Because the man was not wearing a mask at first, Ivey and Robinson saw his face as he walked under the gas pump lights.  (T: 191-94, 237).  Ivey immediately recognized the man as the same person who had "robbed the store previously when [he] and Keenan was in the store," based on his gait, movements, and how he was dressed.  (T: 237, 239).  The man then donned his ski mask, pulled a gun on Robinson and Ivey, and forced them back into the store.  Robinson described the perpetrator as either Latino or a light-skinned black man "in his 20s, 25 maybe."  (T: 192-93).  Robinson observed that he kept pulling down the ski mask as if he "was trying to keep something covered."  (T: 198).

Inside the store, the man ordered Ivey and Robinson to give him all the money from both the register and the safe.  (T: 195-96, 224).  While repeatedly cocking the gun back, the robber instructed them to hurry up or he would shoot them.  (*Id.*).  Ivey kept talking to

try to keep the man's attention focused on him while Robinson filled a bag with money from the drawer, placing the GPS money tracker inside.  (T: 199, 237-38).

Ivey recognized the ski mask and gun from the August 3, 2016 robbery, identifying them as People's Exhibits 46 and 49, respectively.  (T: 239-40, 245-46).  Ivey explained that he recognized the perpetrator based on multiple factors: the perpetrator's "real smooth and ease-like gait"; how he "was pulling this mask down consistently"; "the pants, the way he laced his pants up"; "the hoodie, how it was tucked"; "the glove, the same glove"; the "same funny-looking gun"; the mask; the "sound of his voice, talking about how [']you're done,['] how he gonna kill people and whatnot."  (T: 239-41).  Ivey commented, "It's all the same, and I don't forget a voice."  (T: 241).

Robinson identified People's Exhibit 46, 48, and 49 as the perpetrator's mask, gloves, and gun, respectively.  (T: 197, 210, 212, 222).  When asked if she recognized the perpetrator as anyone in the courtroom, Robinson began shaking and crying.  (T: 194-95, 669-70).  She initially identified Petitioner but moments later said she was "not sure" because it "was so long ago."  (T: 194-95).  Ivey identified Petitioner as the perpetrator from both the August 3rd and September 14th robberies.  (T: 239-41).

As soon as the robber left the Kwik Fill on September 14th with the bag of stolen cash, the money tracker activated and alerted the police.  (T: 262-63, 281, 284).  Using the computer application associated with the GPS tracker, officers watched as the tracker left the Kwik Fill, crossed Hudson Avenue, traveled south on Rosemont Drive, and stopped at the Hill Court Circle apartment complex, about a quarter mile away.  (T: 263-64, 284-85).  Officers had suspected that the perpetrator resided at Hill Court Circle because he had been

seen coming from and going to that apartment complex before and after the previous Kwik Fill and ESL robberies.  (T: 269-70, 278).

Using a handheld beacon device, officers pinpointed the signal from the money tracker to apartment 70-D, where Petitioner lived with his aunt, Yvonne Haynes ("Haynes").  (T: 254-55, 260, 265-266).  Shortly after 9 p.m., IPD officers confronted Haynes in the parking lot as she was taking out the garbage.  (T: 258).  Irondequoit Police Department Captain Mark Bean explained the situation to Haynes, who signed a consent form giving the police permission to enter and search the apartment; she also provided her key to the apartment. (T: 259, 286; People's Exhibit 92).

When officers entered the apartment, they requested Petitioner come out multiple times; he eventually opened his bedroom door and stepped into the hallway.  (T: 323).  Once Petitioner opened the door, officers observed a black ski mask on the desk in his bedroom.  (T: 324).  Petitioner was taken into custody; as part of his pedigree information, he said he was six feet tall and weighed 155 pounds.  (T: 323).  Officers observed "a distinct tattoo of a wolf on [Petitioner's] neck."  (T: 267-68).

After obtaining a search warrant for the apartment, the officers returned to search Petitioner's bedroom.  (T: 324-26).  The officers found two black ski masks, black boots, black sneakers, black pants, a black Champion hooded sweatshirt with diffuse pink staining on the inner back collar, black gloves in a clothes hamper, and cash wrapped in a money band stuffed inside a sneaker.  (T: 326-31, 342-54, 366-67, 590).

The money found in the sneaker included the same bills as those placed with the GPS tracker, which had been disassembled and thrown into Petitioner's garbage bin.  (T:

328, 345-46, 352).  The officers also found a box of ammunition and a .32-caliber black semiautomatic handgun with spray paint obscuring the serial numbers.  (T: 331-32, 342, 353-54 ).  The handgun's firing pin was missing, so the weapon was not functional.  (T: 332, 441).  Forensic testing revealed that the major contributor to the DNA profile found on the black masks matched Petitioner's DNA profile.  (T: 625-27).

### 2.    The Defense Case

The defense rested without calling any witnesses.

### 3.    The Verdict and Sentence

The jury returned a verdict finding Petitioner guilty as charged on all five counts in the indictment.  (T: 717-18).

On October 16, 2017, the trial court sentenced Petitioner to fifteen years' imprisonment plus five years' post-release supervision for the ESL robbery, and ten years' imprisonment plus five years' post-release supervision for each of the Kwik Fill robberies. (S: 10).  The sentences were set to run consecutively to each other.  (*Id.*).[5]

The trial court also issued a restitution order in the amount of $1,447.35, stating that even though "the proof was pretty clear," it would hold a restitution hearing if requested. (S: 7, 11).  Trial counsel did not request a restitution hearing. (S: 11).

### C.    Direct Appeal

Represented by new counsel, Petitioner filed a brief in the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division"), urging

---

[5]    Petitioner's aggregate sentence of 55 years in prison was reduced by operation of law pursuant to P.L. § 70.30(1)(c), (e)(i) (eff. until Sept. 1, 2027).

reversal of his conviction on the grounds that: (1) the verdict was not supported by the weight of the evidence; (2) trial counsel was ineffective because he: (a) failed to include relevant facts in support of the suppression motion, (b) failed to file a motion to sever, (c) was unaware of the statutory cap on the potential sentences for the crimes charged, (d) explained the basis for an objection in a manner that prejudiced the defense, (e) failed to object to questioning the victims about the impact of the robberies on their lives, and (f) failed to request a restitution hearing; (3) the trial court failed to properly instruct the jury about the notations on the verdict sheet; (4) the trial court erroneously entered the restitution order without holding a hearing; and (5) the sentence was unduly harsh and severe.  (SR: 1-76).

The Appellate Division unanimously affirmed the judgment of conviction.  *People v. Coley*, 210 A.D.3d 1505 (4th Dep't 2022).  (SR: 255-57).  The Appellate Division rejected Petitioner's argument that the verdict was against the weight of the evidence, concluding that based on its independent review of the evidence, a different verdict would have been unreasonable.  *Id.* at 1506.  The Appellate Division held that the sentence was not unduly harsh or severe.  *Id.*  The Appellate Division further held that the complaint against trial counsel based on the failure to challenge the restitution order was based on facts outside the record and had to be raised in a motion under C.P.L. § 440.10.  The Appellate Division did not address specifically any of Petitioner's other allegations of ineffectiveness or any of his other issues raised in his opening appellate brief.  The Appellate Division concluded by stating it "ha[d] reviewed defendant's remaining contentions and . . . they do not warrant reversal or modification of the judgment." *Id.*

Appellate counsel filed an application for leave to appeal to the New York Court of Appeals, raising "all issues presented by this appeal," and specifically any violations of Petitioner's right to the effective assistance of counsel. (SR: 252-54). On December 27, 2022, appellate counsel filed a supplemental leave application emphasizing the following issues: trial counsel made an incriminating comment at trial, trial counsel failed to make an adequate motion to suppress physical evidence, and the Appellate Division applied the incorrect standard of review in determining the weight of the evidence claim. (SR: 259-65). On February 2, 2023, the New York Court of Appeals denied leave to appeal. (SR: 270).

### D.    Federal Habeas Proceeding

Petitioner timely filed his *pro se* petition. (Dkt. 1). He asserts that trial counsel was ineffective due to his failure to litigate suppression issues adequately (ground one), the trial court failed to comply with C.P.L. § 310.20(2) when explaining the notations on the verdict sheet to the jurors (ground two), and trial counsel was ineffective due to his failure to object to the inadequate jury instruction regarding the verdict sheet (ground two). Respondent filed a response (Dkt. 15), memorandum of law in opposition (Dkt. 15-1), and the state court records (Dkt. 15-2) and transcripts (Dkt. 15-3).

## III.   DISCUSSION

### A.   Ineffective Assistance of Trial Counsel (Ground One and Part of Ground Two)

Under the heading for ground one, Petitioner asserts that trial counsel "did not provide him with the effective assistance to which he was entitled." (Dkt. 1 at 6). First, trial counsel "did not allege facts in his motion papers" that the police violated Petitioner's Fourth Amendment rights, "which would have put" Haynes' "consent to warrantless entry at issue." (*Id.*).   Second, although trial counsel "seemed to make motions seeking suppression of tangible property," the suppression court did not address trial counsel's attempts to suppress People's Exhibit 50 (the $20-bill packet with GPS tracker battery, T: 291, 359) and People's Exhibit 51 (cash that was stuffed in one of Petitioner's sneakers in the closet, T: 362-63) as the fruit of the poisonous tree. (Dkt. 1 at 6). According to Petitioner, this evidence allowed an "infer[ence] only [of] . . . guilt of possession of stolen property not a guilt of robbery." (*Id.*). Petitioner argues that because there was no probable cause to arrest, the "lack thereof would permit moving to suppress [his] illegal arrest." (*Id.*). Under the heading for ground two, Petitioner faults trial counsel for failing to object when the trial court did not provide the instruction required under C.P.L. § 310.20(2) regarding the verdict sheet notations. (*Id.* at 8).

Respondent argues that the allegations of ineffectiveness in ground one are unexhausted because they were not raised in the proper procedural vehicle in state court (*i.e.*, a C.P.L. § 440.10 motion) and that the allegations in ground two are fully unexhausted

- 13 -

because they were never raised in any application in state court.  (Dkt. 15-1 at 17-18, 28 n.3).

### 1.    Exhaustion

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see also* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State.").  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *Id.* at 845 (citing 28 U.S.C. § 2254(b)(1)).  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *O'Sullivan*, 526 U.S. at 845).

"In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court."  *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 191-92 (2d Cir. 1982) (citing *Picard v. Connor*, 404 U.S. 270, 276-77 (1971)).  "Specifically, he must have set forth in state court all of the essential factual allegations asserted in his federal

petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Id.* (citing *Picard*, 404 U.S. at 276).

A Sixth Amendment claim of ineffective assistance of counsel "can turn on the cumulative effect of all of counsel's actions." *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991) (citing *Strickland v. Washington*, 466 U.S. 668, 695-96 (1984) ("Some errors [by defense counsel] will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.")).  For this reason, the Second Circuit has required *all* of the factual allegations supporting an ineffectiveness claim to be presented together so that the state court may examine all the circumstances and the cumulative effect of counsel's alleged error. *See id.* (holding that the petitioner's "claim of ineffective assistance of counsel ha[d] not received full consideration in the state courts" where it was based on "six enumerated allegations," but "[o]nly the first two of [them] were raised before the state court; the remaining five appear[ed] for the first time in th[e] habeas petition").  To have exhausted his Sixth Amendment ineffective assistance claim, Petitioner must have presented all of trial counsel's alleged errors, as set forth in grounds one and two of the petition, together in one application so that the state court was "given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole." *Grady v. LeFevre*, 846 F.2d 862, 865 (2d Cir. 1988); *accord Caballero v. Keane*, 42 F.3d 738, 740-41 (2d Cir. 1994).

Respondent contends that the ineffectiveness allegations in ground one are unexhausted because, despite being instructed by the Appellate Division that they were

inappropriate for direct appeal and must be raised in a C.P.L. § 440.10 motion, Petitioner did not file a C.P.L. § 440.10 motion asserting them. Respondent's assertion that the Appellate Division instructed Petitioner to raise trial counsel's suppression-related errors in a C.P.L. § 440.10 motion is not reflected in the actual wording of the Appellate Division's decision. As noted above, appellate counsel presented multiple alleged errors by trial counsel, including the failure to challenge the restitution order—an allegation not reasserted in this petition. The only alleged error raised by appellate counsel and specifically addressed by the Appellate Division was trial counsel's failure to challenge the restitution order, which the Appellate Division said could not be resolved without reference to facts outside the record and must be raised in a C.P.L. § 440.10 motion.[6] *Coley*, 210 A.D.3d at 1506. The other alleged errors by trial counsel, including his failure to litigate certain suppression issues, were among the "remaining contentions" that the Appellate

---

[6] "New York courts uniformly hold that where . . . an ineffective assistance of counsel claim turns on facts that are outside of the trial-court record, the claim *must* be brought in collateral proceedings, not on direct appeal." *Pierotti v. Walsh*, 834 F.3d 171, 178 (2d Cir. 2016) (emphasis in original) (citing *People v. Brown*, 45 N.Y.2d 852, 853-54 (1978)). In October 2021, the New York State legislature amended C.P.L. § 440.10(2)(c) to allow review of record-based ineffective assistance of trial counsel claims that could have been brought on direct appeal. *Ocasio v. Noeth*, No. 19-CV-06894 EAW, 2022 WL 4007633, at *5 (W.D.N.Y. Sept. 2, 2022) (citing 2021 N.Y. Assembly Bill No. 2653, N.Y. Two Hundred Forty-Fourth Legislative Session (Oct. 25, 2021)). Even before the 2021 amendment, New York State courts regularly held that when "an ineffective assistance of counsel claim involves . . . 'mixed claims' relating to both record-based and nonrecord-based issues," such a "claim may be brought in a collateral proceeding, whether or not the [defendant] could have raised the claim on direct appeal." *People v. Evans*, 16 N.Y.3d 571, 575 n.2 (2011). That is because "each alleged shortcoming or failure by defense counsel should not be viewed as a separate 'ground or issue raised upon the motion.'" *People v. Wilson*, 162 A.D.3d 1591, 1592 (4th Dep't 2018) (quoting *People v. Taylor*, 156 A.D.3d 86, 91-92 (3d Dep't 2017)).

Division concluded did "not warrant reversal or modification of the judgment." *Id.* The fact that the trial-level errors by counsel were properly raised on direct appeal is supported by appellate counsel's inclusion of them in her initial leave letter to the New York Court of Appeals. (SR: 262-63). And, in her supplemental leave letter, appellate counsel further argued trial counsel's suppression-related errors.

With regard to the allegation in ground two regarding trial counsel's failure to object to the trial court's alleged violation of C.P.L. § 310.20(2), the Court agrees with Respondent that it was not presented in any challenges to Petitioner's conviction in state court.

Thus, even though the allegations of counsel's ineffectiveness in ground one were raised on direct appeal and rejected, the petition has added a new factual premise for finding counsel's representation to have been deficient and prejudicial; namely, the allegation in ground two that trial counsel failed to object when the trial court did not provide the jury instruction required under C.P.L. § 310.20(2). This new factual allegation "may change the claims that were presented at the state level and render the claim unexhausted" since "the state courts would not have been apprised of 'both the factual and legal premises' of the federal claim." *Tirado v. Strange*, No. 3:09CV743 (VLB), 2010 WL 3025540, at *1 (D. Conn. Aug. 2, 2010) (quoting *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997)). Thus, it appears that under the controlling law in the Second Circuit, Petitioner's claim of ineffective assistance of trial counsel, as currently framed in grounds one and two of the petition, is unexhausted.

That said, further examination of this thorny exhaustion issue is unnecessary.  The Court concurs with Respondent that the petition should be dismissed on the merits pursuant to the authority of 28 U.S.C. § 2254(b)(2) (stating that a petition "may be denied on the merits, notwithstanding the failure . . . to exhaust" available state remedies).

### 2.    Dismissal of the Petition Without Prejudice and Granting a Stay-and-Abeyance Are Both Inappropriate

In response to Respondent's assertion of the defense of non-exhaustion, Petitioner initially requested that the Court dismiss the petition without prejudice so that he could return to state court and file a C.P.L. § 440.10 motion to exhaust the ineffective assistance claim. (Dkt. 16).  Respondent filed a letter correctly explaining that if Petitioner voluntarily dismissed the petition without prejudice and attempted to refile the petition after litigating a C.P.L. § 440.10 motion, the refiled petition would be untimely under 28 U.S.C. § 2244(d)(1).  (Dkt. 17 at 1-2).[7]

Petitioner then filed two letters (Dkt. 18; Dkt. 19) requesting a stay-and-abeyance under *Rhines v. Weber*, 544 U.S. 269 (2005).  Because "granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts," the Supreme Court held that granting a stay "is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court," and the

---

[7]    Petitioner's conviction became final on May 3, 2023, 90 days after the New York Court of Appeals denied leave to appeal.  Using the default start-date in 28 U.S.C. § 2244(d)(1)(A), the one-year statute of limitations elapsed on May 3, 2024.  The present habeas petition is not signed or dated; the only evidence as to when it was mailed is the December 29, 2023 post-mark.  (Dkt. 1-2 at 2).  The petition was timely filed, but it has not tolled the statute of limitations under 28 U.S.C. § 2244(d)(2).  *Duncan v. Walker*, 533 U.S. 167, 181-82 (2001).

unexhausted claims are not "plainly meritless." *Id.* at 277-78.  Respondent argues that Petitioner has not fulfilled the stringent standards in *Rhines* for obtaining a stay.  (Dkt. 15-1 at 21-22, Dkt. 17 at 2-3).

Without reaching the good cause issue, the Court concludes that it would be an abuse of discretion to grant a stay in this matter because, as discussed in the following section, Petitioner's claim of ineffective assistance of trial counsel is "plainly meritless." *See Rhines*, 544 U.S. at 277 ("[E]ven if a petitioner had good cause for th[e] failure [to exhaust his claims first in state court], the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.").

### 3. Merits

Federal courts now have the authority to deny a petition containing unexhausted claims on the merits. *See* 28 U.S.C. § 2254(b)(2).  "The rationale behind § 2254(b)(2) has been described as 'spar[ing] state courts from needlessly wasting their judicial resources on addressing meritless claims solely for the sake of exhaustion.'"  *West v. Coueny*, No. 1:19-CV-01353 EAW, 2024 WL 1469822, at *11 (W.D.N.Y. Apr. 4, 2024) (quoting *Keating v. New York*, 708 F. Supp. 2d 292, 299 n.11 (E.D.N.Y. 2010)).  "In this Circuit, the various formulations for the proper standard to be used when relying on § 2254(b)(2) share 'the common thread of disposing of unexhausted claims that are unquestionably meritless.'"  *Id.* (quoting *Keating*, 708 F. Supp. 2d at 299 n.11 (collecting cases)); *see also Rhines*, 544 U.S. at 277 (stating that it would be an abuse of discretion to grant a stay when a petitioner has demonstrated "good cause" but his unexhausted claims are "plainly

meritless"). When evaluated *de novo* under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), Petitioner's unexhausted claim is plainly without merit.

"[T]he Sixth Amendment right to counsel exists 'in order to protect the fundamental right to a fair trial.'" *Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993) (quoting *Strickland*, 466 U.S. at 684). There are "two components to any ineffective assistance claim: (1) deficient performance and (2) prejudice." *Fretwell*, 506 U.S. at 369. A defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable*." *Strickland*, 466 U.S. at 687 (emphasis supplied). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, "[t]he essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

### a.    Failure to Litigate Suppression Issues Adequately

Because questions regarding the admissibility of relevant evidence seldom touch upon the "basic justice," *Stone v. Powell*, 428 U.S. 465, 492 n.31 (1976), of a conviction, the Supreme Court has determined that Fourth Amendment claims are precluded from habeas review, *Kuhlmann v. Wilson*, 477 U.S. 436, 446-47 (1986) (reiterating that "any 'advance of the legitimate goal of furthering Fourth Amendment rights' through application of the judicially created exclusionary rule on federal habeas was 'outweighed by the acknowledged costs to other values vital to a rational system of criminal justice'" (quoting *Stone*, 428 U.S. at 494-95)).

However, a habeas petitioner may assert a Sixth Amendment claim based on trial counsel's failure to move for the suppression of evidence under the Fourth Amendment. *Kimmelman*, 477 U.S. at 382-83.  The Supreme Court has stated that:

> [w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious *and* that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.

*Id.* at 375 (emphasis supplied).  "Although a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim . . . , a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief."  *Id.* at 382.

Here, the factual record shows that Petitioner did not have a meritorious Fourth Amendment issue that trial counsel unjustifiably failed to pursue.  On April 18, 2017, trial counsel filed an omnibus motion that included, among other things, a motion to suppress tangible evidence seized from Petitioner at his apartment along with a request for an evidentiary hearing on that issue.  (SR: 91).  The motion, made prior to discovery, did not plead any facts specific to Petitioner's case but did request the ability to renew the motion "if . . . the People divulge information which was not previously known to [trial counsel] and which information, in turn, necessitates further hearings and requests."  (SR: 113; *see also* SR: 133 (reserving right to bring further motions "such as suppression of evidence or statements if[,] through discovery, . . . such becomes necessary or appropriate")).

In opposition, the prosecutor submitted an affirmation detailing the circumstances of the search and seizure at Petitioner's apartment, based on the prosecutor's review of the reports prepared in the case as well as her conversations with relevant witnesses:

> On September 14, 2016[,] at approximately 8:51pm[,] members of the Irondequoit Police Department were notified via text message that the [GPS] money tracker had been moved and was in motion. Simultaneously, they were advised by 911 dispatch that a call for a gun point robbery had just occurred at the same location with a suspect description of a light skinned black male in his early 20's wearing all black clothing. Via a handheld GPS tracking device, IPD was able to follow and pinpoint the signal precisely at 70 Hill Court Circle, Apartment D. There they met with the tenant, Yvonne Haynes, who informed officers that her nephew, Terry Coley, who lives with her had "left the apartment sometime around 8pm and returned around 9pm." Ms. Haynes also provided the officer with a physical description of Terry Coley that matched that of the suspect. Haynes then provided consent to search the apartment. Once inside, the officers went to the door of Terry Coley's bedroom and knocked. Coley voluntarily opened the door and exited into the hallway. Once the door was open, in plain view in the bedroom was a black ski mask matching the description of the mask used by the suspect in all previous robberies. At this point the defendant was taken into custody and his bedroom was secured pending a Search Warrant. Upon execution of the Search Warrant, the following items were located: a black ski mask, black hoody, black face mask, black boots, a bundle of US Currency with a pink $250 band, two boxes of ammunition, a black .32 caliber handgun, the [GPS] money tracker and bills bearing serial numbers matching those planted with the tracker.

(SR: 154-55). The prosecution argued that based on the facts outlined above, the police had probable cause to arrest Petitioner. (SR: 155).

At a hearing on pre-trial motions held on May 10, 2017, Monroe County Supreme Court Justice Alex Renzi ("motion court") noted that trial counsel had made a "boilerplate request" for a suppression hearing but had not included any facts to challenge the prosecutor's detailed explanation of the factual circumstances surrounding the search. (Transcript of May 10, 2017 Motion Hearing ("05/10/17 Tr.") at 2).[8] The motion court observed:

---

[8]     The May 10, 2017 transcript is located at pages 6 to 10 of Docket 15-3.

> What [the prosecution] spell[s] out in the papers is that [the police] have their chip inside the money pack, went into the house with permission from somebody who lives there, get to the bedroom door, knock on it. [Petitioner] answers the door, they look in and see a mask, they bring him out, arrest him, get a search warrant, search the bedroom, and it turns up the mask, and I don't know what else is recovered.

(*Id.*). The motion court noted that Petitioner's omnibus motion did not refute those facts; for example, Petitioner did not assert that "he didn't answer the door, [or] they kicked the door in, or something to that effect." (*Id.* at 2-3). The motion court denied the suppression request in the omnibus motion but offered trial counsel the opportunity to file a supplemental suppression motion with additional facts. Trial counsel declined to do so. (*Id.* at 3).

Petitioner has never offered any basis to rebut the accuracy of the prosecution's factual representations regarding the search and seizure. Thus, he has not demonstrated the existence of a colorable suppression issue, much less a clearly meritorious one. The record establishes that trial counsel made an objectively reasonable decision not to renew the suppression motion. Because Petitioner has not established deficient performance or prejudice, his *Strickland* claim based on the failure to renew the suppression motion fails.

Petitioner's claim that trial counsel was ineffective for failing to argue that the police exceeded the scope of the consent granted by his aunt is not supported by the record. According to Petitioner, the consent form signed by Haynes "contained language that police were to 'only attempt to get Terry Coley to exit apartment willingly.'" (Dkt. 1 at 7 (citation omitted in original)). While the consent form stated, under the heading "Other," that Haynes was allowing the police "[t]o attempt to get Terry Coley to come out" (Dkt.

- 23 -

15-4 at 1 (People's Exhibit 92)), it clearly permitted the police officers to enter and search the shared apartment (*id.* (allowing the police to search "[a]ny and all areas, both inside and outside of" the apartment)).

The police may enter or search a location without a warrant where, as here, "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). However, the police did not search the apartment based on the consent form signed by Haynes. Instead, the police merely entered the apartment. Once Petitioner voluntarily opened his bedroom door, the police observed, in plain view, a black ski mask on Petitioner's desk.

"Under the plain-view exception, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). The police did not seize the black ski mask at the time they initially entered Haynes' apartment, although they lawfully could have done so. Instead, they relied on this incriminating item, which they saw in "plain view," for purposes of obtaining a search warrant. Petitioner did not have a meritorious argument based on alleged limitations on the scope of the consent authorized by his aunt. It was objectively reasonable for trial counsel to decide not to pursue any suppression motion based on the police officers' alleged violation of the consent form. Even if trial counsel had brought such a motion, it would not have succeeded.

- 24 -

Moreover, Petitioner has not shown that there was any reasonable possibility of an acquittal if trial counsel had performed as desired and had succeeded in suppressing the results of the search. As Respondent argues, there was compelling evidence of Petitioner's guilt that was wholly independent of the evidence seized in the search. (Dkt. 15-1 at 27-28). Ivey, the Kwik-Fill employee present during the August 3rd and September 14th robberies, definitively identified Petitioner in court. Witnesses from the Kwik-Fill robberies and the ESL robbery all provided a similar description of the perpetrator—a tall, slim Latino or light-complected African-American man carrying a small, black gun, and wearing a black ski mask, black gloves, a black hooded sweatshirt, and black pants. This description of the perpetrator's appearance was confirmed by video footage from the surveillance cameras at Kwik-Fill and ESL. Multiple witnesses saw the perpetrator in each of the robberies coming from or running to the Hill Court Circle apartments where Petitioner lived with his aunt. On the night of Petitioner's arrest, the police followed the GPS money-tracker signal from the Kwik-Fill to the specific apartment where Petitioner lived.

As a matter of New York State law, similarities between crimes may be considered as circumstantial evidence of guilt where the crimes share enough distinctive aspects to establish a pattern that is probative of the defendant's identification. *See, e.g., People v. Hyatt*, 38 A.D.3d 233, 153 (1st Dep't 2007) (finding that an instruction against "commingling" of evidence would have been erroneous since "[t]he evidence as to each robbery tended to prove the other, because the two robberies shared a pattern that was sufficiently distinctive so as to warrant an inference that they were committed by the same

person" (citing *People v. Beam*, 57 N.Y.2d 241, 253 (1982) (finding that "the pattern [of attack] used by the defendant in these cases was sufficiently unusual to establish a specific *modus operandi*, making the evidence of the other attacks highly probative of the assailant's identity"))); *People v. Garcia*, 120 A.D.3d 406, 407 (1st Dep't 2014) (finding that two burglaries, committed over two days, "shared many features that formed a pattern when viewed collectively" and that while they were "not identical, '[i]t is not necessary that the pattern be ritualistic for it to be considered unique; it is sufficient that it be a pattern which is distinctive'" (alteration in original) (quoting *Beam*, 57 N.Y.2d at 253)).

Here, the evidence, viewed collectively, showed that each robbery shared enough distinctive features to support the conclusion they were part of a pattern and were committed by Petitioner. For example, Petitioner matched the physical description of the robber; wore the same all black attire and accessories; used the same small, black gun; performed the same behaviors during the robberies, such as cocking the gun repeatedly and making similar threats toward the employees and customers; had a distinctive walk; and was seen coming from or going to the same location before and after the robberies. *See Porter v. Martuscello*, No. 16CIV1417WHPHBP, 2018 WL 8895807, at *16 (S.D.N.Y. Aug. 10, 2018) (finding that testimony from three officers who observed the petitioner and an accomplice was "more than sufficient to prove" that the petitioner and his accomplice stole a third party's property, appropriated it for their own use and benefit, and had no intent to return it; when arrested for pickpocketing a woman, the petitioner was found in possession of the third party's school ID; the petitioner acted as a lookout for his accomplice while she attempted to use a credit card similar in appearance to the third

party's credit card; and the petitioner was in close proximity to the accomplice as she disposed of the third party's credit card shortly after it was declined at a different store), *adopted*, No. 16CV1417, 2019 WL 2537415 (S.D.N.Y. June 20, 2019). On the record before this Court, Petitioner has failed to show that trial counsel's failure to pursue a suppression motion deprived him of a fundamentally fair trial or rendered the verdict suspect in any way.

> **b.    Failure to Object to the Trial Court's Instructions Regarding the Verdict Sheet (Ground Two)**

Petitioner contends that trial counsel was ineffective for failing to object to the trial court's inadequate explanation to the jury regarding the purposes of the notations to the verdict sheet. On direct appeal, the Appellate Division summarily rejected Petitioner's contention that the trial court's instruction to the jury regarding the verdict sheet was deficient. *Coley*, 210 A.D. at 1506. Because the Appellate Division rejected the underlying claim—the adequacy of the trial court's explanation—as meritless, trial counsel did not perform deficiently by declining to object on that basis. In other words, because the Appellate Division reviewed the merits of this claim notwithstanding the lack of timely objection, Petitioner cannot demonstrate that he was prejudiced due to trial counsel's failure to object. *See, e.g., Walker v. Bennett*, 262 F. Supp. 2d 25, 40 (W.D.N.Y. 2003) (finding that the petitioner was "unable to establish prejudice based on counsel's failure to object to the prosecutor's remarks" where "the Appellate Division reviewed the prosecutorial misconduct claim and found that the prosecutor's summation constituted fair response to the defense summation").

### B.    Trial Court's Failure to Provide Adequate Instruction Regarding the Notations to the Verdict Sheet (Ground Two)

In his second ground for relief, Petitioner claims that the trial court's jury instruction on the annotated verdict sheet (SR: 173) did not satisfy C.P.L. § 310.20(2). (Dkt. 1 at 8). As noted above, the jury was asked to consider five separate counts of second-degree robbery. To assist the jury in understanding which count related to which robbery, the verdict sheet had two columns. (SR: 173). On the left side, the verdict sheet listed each of the five counts with a parenthetical identifying the location and date of the alleged offense charged in that count (e.g., "Kwik Fill – 5/20," "ESL – 6/20"). (*Id.*). On the right side, next to each count, the verdict sheet left a space for the jury to indicate its verdict for that specific count (i.e., "guilty" or "not guilty"). (*Id.*). The jury indicated its guilty verdicts on all five counts by marking the verdict sheet with an "X" beside each of the five counts. (*Id.*).

> While instructing the jury, the trial court stated:
>
> You're going to be given a verdict sheet, and it will list the five counts. And in parentheses, like the first count, it says Kwik Fill on May 20. So the first count deals with Kwik Fill, May 20; second count is ESL, 6/20. And that's all listed on the verdict sheet, okay, to help you follow through.

(T: 709). On direct appeal, Petitioner argued that the trial court's instruction violated C.P.L. § 310.20(2) because it did not strictly adhere to the wording of the pattern Criminal Jury Instructions. (SR: 67-69 (citing CJI2 (NY) Verdict Sheet Explained)). The Appellate Division rejected this argument without comment. *Coley*, 210 A.D.3d at 1506.

As a matter of New York State statute, "deliberating jurors may be provided with '[a] written list prepared by the court containing the offenses submitted to the jury by the

- 28 -

court in its charge and the possible verdicts thereon.'" *People v. Williams*, 101 A.D.3d 1728, 1728 (4th Dep't 2012) (quoting C.P.L. § 310.20(2)). When the state court "submits two or more counts charging offenses set forth in the same article of the law," *id.*, the verdict sheet "may set forth the dates, names of complainants or specific statutory language, without defining the terms, by which the counts may be distinguished, *id.* "[H]owever, . . . the court shall instruct the jury in its charge that the sole purpose of the notations is to distinguish between the counts." *Id.* Petitioner argues that the trial court violated C.P.L. § 310.20(2) because it "did not explain that the notations were solely to distinguish the counts." (SR: 67).

As the Supreme Court has emphasized repeatedly, it is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Federal habeas review is "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68 (citing 28 U.S.C. § 2254(a)). Because the allegations in ground two assert only that the Appellate Division erroneously applied state precedent in resolving a question of state law, they do not set forth a question of federal constitutional magnitude. Therefore, the portion of ground two asserting a violation of C.P.L. § 310.20(2) is dismissed as not cognizable on habeas review.

## IV.   CONCLUSION

For the reasons above, Petitioner's request for a stay-and-abeyance (Dkt. 18, Dkt. 19) is denied, the request for a writ of habeas corpus is denied, and the petition (Dkt. 1) is dismissed. The Court declines to issue a certificate of appealability under 28 U.S.C.

§ 2253(c)(1) because Petitioner has failed to make "a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). The Clerk of Court is further directed to close this case.

   SO ORDERED.

             _____
             ELIZABETH A. WOLFORD
             Chief Judge
             United States District Court

Dated:   July 7, 2026
      Rochester, New York